Hoover, J.
{¶ 1} The trial court granted summary judgment to plaintiff-appellee Barclay Petroleum, Inc. ("Barclay"), in a dispute concerning the validity of a 1985 oil and gas lease (the "lease"). In competing motions for summary judgment, Barclay argued that the lease remained valid and in effect, whereas the defendants-appellants, Matthew and Lora Bailey, Trustees of the Bailey Family Trust Dated 1/12/2007 (the "Baileys"), argued that the lease had been cancelled under its terms and by operation of law because of lack of production. Because we agree with the Baileys that the lease terminated under its own terms and by operation of law, we reverse the judgment of the trial court.
I. Facts
{¶ 2} In October 1984, Darrell and Janet Lucas granted an oil and gas lease to Marjac Energy Company. Marjac assigned its lease rights to Barclay in 1987.[1] The *815 lease covered 70 acres in Marion Township, Hocking County, Ohio, including the 17.986 acres now owned by the Baileys. The Lucases granted Marjac and its successors or assignees the right to drill for, produce, and sell oil and gas under the property for a primary term of one year and a secondary term "as long thereafter as oil, gas, or casinghead gas is produced from the leased premises or operations are continued * * *". In return, the Lucases were to receive a 12.5% royalty on all oil and gas produced and sold from their land. The lease also provided that the Lucases were to receive free gas for their house on the leasehold property.
{¶ 3} In July 1985, the Lucas # 1 Well was drilled and completed on the leasehold property. It is undisputed that the Lucas #1 Well continuously produced oil and/or natural gas for commercial sale for a period of twenty years until 2005. However, according to records from the Ohio Department of Natural Resources, after 2005 the Lucas # 1 Well produced no oil or gas for commercial sale during at least six years: 2006, 2008, 2009, 2010, 2011, and 2012.
{¶ 4} In October 1988, the Lucas # 2 Well was drilled and completed on the leasehold property. The Lucas # 2 Well continuously produced oil and/or natural gas for commercial sale for 12 years until 2000. However, again according to records from the Ohio Department of Natural Resources, the well produced no oil or gas for commercial sale after 2000 during at least ten years: 2001, 2002, 2003, 2004, 2005, 2006, 2008, 2010, 2011, and 2012.
{¶ 5} In November 1988, the Lucas # 3 Well was drilled and completed on the leasehold property. The Lucas # 3 Well continuously produced oil and/or natural gas for commercial sale for 12 years until 2000. However, according to records from the Ohio Department of Natural Resources, the well produced no oil or gas for commercial sale after 2000 during at least ten years: 2001, 2002, 2003, 2004, 2005, 2006, 2008, 2010, 2011, and 2012.
{¶ 6} Despite the above-described limited commercial production during the mid and late 2000's, it is undisputed that Barclay continued to operate and maintain the well that produced the household gas during that time period. The Lucases never experienced any prolonged interruption of household gas service, and Barclay promptly remedied any temporary interruption of service. The Lucases were content with the free gas used to heat their house and did nothing to cancel the lease.
{¶ 7} The Lucas # 1, # 2, and # 3 Wells are the only wells on the leasehold property. In 2012, the Lucases split their 70 acres into four separate tracts and sold each tract to Wilcox Land Finance Company, LLC. Wilcox Land Finance Company, LLC then re-sold each tract to four families. Steven and Paula Kaiser bought a tract containing approximately 36 acres; Daniel and Rita Caldwell purchased a tract comprised of 12 acres; Melodye Davis purchased the 5-acre tract containing the Lucases' house; and the Baileys purchased the remaining 17.986 acres. The Lucas # 3 Well is the only well located on the Baileys' property.
{¶ 8} Shortly after the Baileys took possession of their property in November 2012, a dispute arose between the Baileys and Barclay. The Baileys alleged that Barclay had abandoned and neglected to maintain and operate the Lucas Wells. Barclay, meanwhile, alleged that the Baileys interfered with their right to operate and maintain the Lucas # 3 Well. Despite the dispute, the wells produced enough oil to create more than $800 worth of landowner *816 royalties in 2013. The Kaisers, Caldwells, and Ms. Davis all cashed royalty checks from the oil sales. Ms. Davis also uses gas from the Lucas Wells to heat her home. The Baileys did not cash any royalty checks from the oil sales.
{¶ 9} Eventually the dispute gave rise to the Barclay complaint filed in this lawsuit on February 12, 2014, which seeks damages and injunctive relief to ensure continued access to the Lucas # 3 Well located on the Baileys' property. On March 18, 2014, the Baileys filed an answer and counterclaims seeking a declaratory judgment quieting title in their favor, and alleging that the lease had expired under its terms due to the failure to produce oil, gas, or casinghead gas and Barclay's failure to otherwise continue operations. The Baileys' counterclaims also include a claim for forfeiture due to breach of various implied duties.
{¶ 10} On April 1, 2015, the Baileys filed a motion for summary judgment, again contending that the lease had expired on its terms by operation of law due to non-production of the wells. On April 17, 2015, Barclay filed a cross-motion for summary judgment claiming that the lease remained valid and in effect. Barclay alleged that the Baileys' interpretation of the lease was incorrect, and that the Lucases, the landowners at the time of the alleged non-production, had expressly approved of Barclay's performance under the lease. Specifically, Barclay alleged that the Lucases had expressly agreed that production of gas for their home on the leasehold property was sufficient to hold the lease-and that the doctrines of modification, waiver, and estoppel barred the Baileys from claiming the lease had terminated.
{¶ 11} On May 10, 2016, the trial court issued its decision and judgment entry on the competing motions for summary judgment. In its decision and judgment entry the trial court determined that the lease remained valid and in effect and awarded Barclay summary judgment. Specifically, the trial court determined that under the terms of the lease Barclay's production of gas for the Lucases domestic use was sufficient to hold the lease. Alternatively, the trial court found that the Lucases' longstanding course of performance had modified the lease. Of note, the trial court stated: "The undisputed facts are that Barclay provided free gas and the Lucases were satisfied with this performance." Thus, the trial court found that: "[T]he agreement was modified so that the provision of the free gas was sufficient performance to have the lease continue in effect." Finally, the trial court found-again in the alternative-that the Lucases had waived their right to challenge the validity of lease by not challenging its validity when non-production first occurred in the early to mid-2000's, and that the Baileys, as the Lucases successors-in-interest, were estopped by the doctrine of waiver from challenging the validity of the lease.
{¶ 12} The Baileys filed a timely notice of appeal from the trial court's May 10, 2016 decision and judgment entry.
II. Assignments of Error
{¶ 13} The Baileys raise four assignments of error for our review.
First Assignment of Error:
The trial court erred as a matter of law when it concluded that the subject oil and gas Lease did not automatically expire on its own terms and by operation of law in the early 2000s when the Lessee failed to continually satisfy the express production requirement contained in the Lease's unambiguous habendum clause which required commercial, non-domestic production of oil and/or natural gas in order for the Lease to remain valid and in effect beyond its primary term.
*817 Second Assignment of Error:
The trial court erred as a matter of law when it concluded that the Lease had been modified by the parties' course of performance.
Third Assignment of Error:
The trial court erred as a matter of law when it failed to find that the Lease converted into a tenancy at will upon its automatic expiration by operation of law.
Fourth Assignment of Error:
The trial court erred as a matter of law when it concluded that the Baileys were estopped from having the Lease declared cancelled.
III. Law and Analysis
{¶ 14} Because the Baileys' assigned errors are interrelated, we address them jointly. Essentially, the Baileys argue that the trial court erred by granting Barclay's cross-motion for summary judgment and by denying their competing motion for summary judgment. The Baileys contend that the lease expired under its terms and by operation of law when the wells failed to produce oil or gas for commercial sale in the mid to late 2000's; that upon the automatic termination of the lease a tenancy relationship was formed between Barclay and the landowners; that because the lease had been automatically terminated it was incapable of being modified and that any alleged modification before the termination of the lease was not supported by new consideration or a different course of conduct; and that the doctrines of waiver and estoppel do not apply.
A. Standard of Review
{¶ 15} We review the trial court's decision on a motion for summary judgment de novo. Smith v. McBride , 130 Ohio St.3d 51, 2011-Ohio-4674, 955 N.E.2d 954, ¶ 12. Accordingly, we afford no deference to the trial court's decision and independently review the record and the inferences that can be drawn from it to determine whether summary judgment is appropriate. Harter v. Chillicothe Long-Term Care, Inc. , 4th Dist. Ross No. 11CA3277, 2012-Ohio-2464, 2012 WL 1997821, ¶ 12 ; Grimes v. Grimes , 4th Dist. Washington No. 08CA35, 2009-Ohio-3126, 2009 WL 1830761, ¶ 16.
{¶ 16} Summary judgment is appropriate only when the following have been established: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party. Civ.R. 56(C) ; DIRECTV, Inc. v. Levin , 128 Ohio St.3d 68, 2010-Ohio-6279, 941 N.E.2d 1187, ¶ 15. In ruling on a motion for summary judgment, the court must construe the record and all inferences therefrom in the nonmoving party's favor. Civ.R. 56(C). The party moving for summary judgment bears the initial burden to demonstrate that no genuine issues of material fact exist and that they are entitled to judgment in their favor as a matter of law. Dresher v. Burt , 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). To meet its burden, the moving party must specifically refer to "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action," that affirmatively demonstrate that the nonmoving party has no evidence to support the nonmoving party's claims. Civ.R. 56(C) ; Dresher at 293, 662 N.E.2d 264. Moreover, the trial court may consider evidence not expressly mentioned in Civ.R. 56(C) if such evidence is incorporated by reference in a properly framed affidavit pursuant to Civ.R. 56(E).
*818 Discover Bank v. Combs , 4th Dist. Pickaway No. 11CA25, 2012-Ohio-3150, 2012 WL 2832550, ¶ 17 ; Wagner v. Young , 4th Dist. Athens No. CA1435, 1990 WL 119247, *4 (Aug. 8, 1990). Once that burden is met, the nonmoving party then has a reciprocal burden to set forth specific facts to show that there is a genuine issue for trial. Dresher at 293, 662 N.E.2d 264 ; Civ.R. 56(E).
{¶ 17} "In addition, this case involves the interpretation of a written contract, which is a matter of law that we review de novo." Bohlen v. Anadarko E & P Onshore, LLC , 2014-Ohio-5819, 26 N.E.3d 1176, ¶ 12 (4th Dist.), citing Arnott v. Arnott, 132 Ohio St.3d 401, 2012-Ohio-3208, 972 N.E.2d 586, ¶ 14. Our role is to ascertain and give effect to the intent of the parties, which is presumed to lie in the contract language. Arnott at ¶ 14 ; see also Bohlen v. Anadarko E&P Onshore, LLC , 150 Ohio St.3d 197, 2017-Ohio-4025, 80 N.E.3d 468, ¶ 15 (Quotations omitted.)("When determining the rights of parties under oil and gas leases, courts must apply a cardinal principle of contract law: the unambiguous language of the contract governs, and courts will not give the contract a construction other than that which the plain language of the contract provides."). "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." Alexander v. Buckeye Pipe Line Co., 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus, superseded by statute on other grounds.
{¶ 18} More specifically, "[t]he rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument" and "[s]uch leases are contracts, and the terms of the contract with the law applicable to such terms must govern the rights and remedies of the parties." Harris v. Ohio Oil Co., 57 Ohio St. 118, 129, 48 N.E. 502 (1897) ; Harding v. Viking Internatl. Resources Co., 2013-Ohio-5236, 1 N.E.3d 872, ¶ 11 (4th Dist.).
B. Expiration of Lease on its Own Terms
{¶ 19} The Baileys first contend that the trial court erred in granting summary judgment in favor of Barclay because the lease terminated by its own terms, i.e. by operation of law. In particular, the Baileys cite the lack of oil and gas production in the mid to late 2000's and early part of this decade, in which the wells only produced gas for domestic use, and assert that the trial court erred in denying their claim that the lease expired by its own terms.
{¶ 20} The lease at issue contains a habendum clause with a primary and secondary term. Under the secondary term of the habendum clause, after the initial one-year term, the lease continues "as long thereafter as oil, gas, or casinghead gas is produced from the leased premises or operations are continued * * *." Meanwhile, Ohio law dictates, "the term 'produced' [when used] in a habendum clause means 'produced in paying quantities [.]' " Morrison v. Petro Evaluation Servs., Inc. , 5th Dist. Morrow No. 2004CA0004, 2005-Ohio-5640, 2005 WL 2715578, ¶ 39. "The term 'paying quantities,' * * * has been construed by the weight of authority to mean 'quantities of oil or gas sufficient to yield a profit , even small, to the lessee over operating expenses, even though the drilling costs, or equipping costs, are not recovered, and even though the undertaking as a whole may thus result in a loss.' " (Emphasis added.) Blausey v. Stein, 61 Ohio St.2d 264, 265-266, 400 N.E.2d 408 (1980), quoting Annotation, 43 A.L.R.3d 8, 25. Furthermore, this Court and other Ohio appellate courts have previously clarified that *819 that the term "production" when used in the habendum clause of an oil and gas lease does not include production for domestic use only. See Pottmeyer v. E. Ohio Gas Co. , 2016-Ohio-1294, 62 N.E.3d 617, ¶ 37 (4th Dist.) ("[T]he landowners' personal use of the gas does not count towards the calculation of gas produced in paying quantities. Rather, the landowners' use of the gas is incidental to the purpose of the lease[ ]."); Yoder v. Stocker & Sitler Oil Co. , 5th Dist. Holmes No. CA-465, 1993 WL 95604 (Mar. 30, 1993) (concluding that non-commercial use of free domestic gas by a landowner did not constitute production in paying quantities); Gardner v. Oxford Oil Co. , 2013-Ohio-5885, 7 N.E.3d 510, ¶ 40 (7th Dist.) ("[O]nly commercial oil and gas production by the lessee oil and gas companies [can] preserve [an oil and gas lease] under the habendum clause."); Tisdale v. Walla , 11th Dist. Ashtabula No. 94-A-0088, 1994 WL 738744 (Dec. 23, 1994) (concluding that domestic use plus use of a commercial activity-pig farming-is insufficient to constitute "production in paying quantities" because production pursuant to the lease must stem from commercial drilling operations, not merely any commercial use of the domestic gas.).
{¶ 21} "We have consistently recognized that an oil and gas lease containing a habendum clause stating the lease shall remain in force as long as paying quantities are produced expires when there is no oil or gas produced for two years or more[.]" Schultheiss v. Heinrich Ents., Inc. , 2016-Ohio-121, 57 N.E.3d 361, ¶ 19 (4th Dist.), citing Lauer v. Positron Energy Resources, Inc. , 4th Dist. Washington No. 13CA39, 2014-Ohio-4850, ¶ 12, and Wagner v. Smith , 8 Ohio App.3d 90, 92-94, 456 N.E.2d 523 (4th Dist. 1982). Furthermore, we clarified that "[a]fter the expiration of the primary term of the oil and gas lease, if the conditions of the secondary term are not met, the lease automatically expires." Id . at ¶ 23. "The terminology utilized in the habendum clause ( [e.g.,] 'and as long thereafter as') is generally construed to create a determinable fee interest, such that the lessee's interest automatically terminates upon lessee's failure to satisfy any of the listed provisions would serve to extend the terms of the lease. In such a case, no affirmative action on the part of the lessor is required to formally terminate the lease; it expires on its own terms ." (Emphasis added.) Tisdale at *4 ; see also Am. Energy Servs. v. Lekan , 75 Ohio App.3d 205, 212, 598 N.E.2d 1315 (5th Dist. 1992) ("If after the expiration of the primary term the conditions of the secondary term are not continuing to be met, the lease terminates by the express terms of the contract herein and by operation of law and revests the leased estate in the lessor").
{¶ 22} Here, under the express terms of the lease's habendum clause, the lease only remained valid and in effect after the expiration of the primary term so long as at least one of the Lucas Wells was producing oil or gas in paying quantities or the lessee was conducting operations under the lease; this did not occur. A review of the record demonstrates that Barclay failed to produce and market or sell any oil or natural gas from the entire leasehold property for the following five years: 2006, 2008, 2010, 2011, and 2012. Furthermore, Barclay's contention that its maintenance of the wells-conducted to ensure production of gas for the Lucases domestic use-constitutes "operations" sufficient to hold the lease is also without merit. In construing a similar habendum clause, this Court has concluded that the incidental use of domestic gas by the property owner is insufficient to constitute operations. Pottmeyer at ¶ 44, citing Gardner at ¶ 42.
{¶ 23} Therefore, when Barclay failed to meet the conditions of the secondary term of the habendum clause of the lease because *820 there was not production from the wells from 2010-2012, a period greater than two successive years, the lease terminated automatically by its own terms and by operation of law. Furthermore, the continued production of gas during that period to heat the Lucases' home was not sufficient to ensure continuation of the lease. Finally, neither the Baileys nor their predecessors-in-interest were required to take further action to formally terminate the lease.
C. The Lease Was Not Modified Through the Parties' Course of Performance or by Oral Agreement
{¶ 24} Barclay argues, and the trial court found, that the parties' course of performance created a new implied contract that modified the terms of the original lease, pursuant to which the Lucases, the Baileys' predecessors-in-interest, agreed that the production of gas for use in their household was sufficient to hold the lease. In addition, Barclay alleges that the Lucases orally agreed to modify the lease, expressly stating that production of gas for domestic use only was sufficient to hold the lease. We disagree that the lease was modified by the parties' course of performance or by oral agreement.
{¶ 25} "A contract can be modified when there is clear and convincing evidence of the parties' mutual intent to modify the contract through their course of dealing." Third Fed. S. & L. Assn. of Cleveland v. Formanik, 8th Dist. Cuyahoga Nos. 100562 & 100810, 2014-Ohio-3234, 2014 WL 3700514, ¶ 13, citing Westgate Ford Truck Sales, Inc. v. Ford Motor Co., 2012-Ohio-1942, 971 N.E.2d 967, ¶¶ 24-25 (8th Dist.) ; see also RotoSolutions, Inc. v. Crane Plastics Siding, L.L.C., 10th Dist. Franklin Nos. 13AP-1 & 13AP-52, 2013-Ohio-4343, 2013 WL 5451702, ¶ 19 (" '[A]n oral modification of a written contract can be enforceable notwithstanding a provision in the contract requiring modifications to be in writing where * * * the parties have engaged in a course of conduct in conformance with the oral modification and where the party seeking to enforce the oral modification would suffer injury if the modification were deemed invalid.' "), quoting Exact Software N. Am., Inc. v. Infocon Sys., Inc., N.D.Ohio No. 3:03CV7183, 2004 WL 952876 (Apr. 16, 2004) ; Miller Lakes Community Servs. Assn., Inc. v. Schmitt, 9th Dist. Wayne, 2016-Ohio-339, 2016 WL 515641, ¶¶ 18, 30 (" 'Parties may implicitly modify an agreement by their actions. A continued, different, course of performance between parties manifests a modification of the original agreement.' "), quoting St. Marys v. Auglaize Cty. Bd. of Commrs., 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561, ¶ 39 ; Kwikcolor Sand v. Fairmount Minerals Ltd., 8th Dist. Cuyahoga No. 96717, 2011-Ohio-6646, 2011 WL 6775580, ¶¶ 20-22 (where it was undisputed that the parties orally agreed to modify contract's pricing schedule and operated under the modified pricing schedule for more than a year, plaintiff waived the contract's no-oral modification provision and the parties were contractually bound to the modified pricing structure). "[E]ven contracts that are required by the statute of frauds to be in writing can be modified orally 'when the parties to the written agreement act upon the terms of the oral agreement.' " Formanik at ¶ 13, quoting 200 W. Apts. v. Foreman, 8th Dist. Cuyahoga No. 66107, 1994 WL 505271 (Sept. 15, 1994) ; see also 3637 Green Rd. Co. v. Specialized Component Sales Co., 2016-Ohio-5324, 69 N.E.3d 1083, ¶¶ 21-25, 30-35 (8th Dist.) (substantial, competent credible evidence supported the trial court's conclusion that commercial landlord waived lease's no-oral-modification and written waiver provisions by its subsequent course of conduct, resulting in an enforceable oral agreement to reduce the rent due under *821 the lease, where the landlord's records showed that landlord "invoiced" monthly rent at reduced rate and tenant "paid" monthly rent at reduced rate leaving a zero balance due on the account). Accord Third Fed. S. & L. Assn. of Cleveland v. Formanik , 2016-Ohio-7478, 64 N.E.3d 1034, ¶ 32 (8th Dist.).
{¶ 26} "[S]ubsequent acts and agreements may modify the terms of a contract, and unless otherwise specified, neither consideration nor a writing is necessary. Oral agreements to modify a prior written agreement are binding if based upon new and separate legal consideration or, even if gratuitous, are so acted upon by the parties that a refusal to enforce the oral modifications would result in fraud to the promisee." Corsaro v. ARC Westlake Village, Inc., 8th Dist. Cuyahoga No. 84858, 2005-Ohio-1982, 2005 WL 984502, ¶ 16 ; see also Wells Fargo Bank, N.A. v. Baldwin , 12th Dist. Butler No. CA2011-12-227, 2012-Ohio-3424, 2012 WL 3064495, ¶ 14 ("[T]o have the effect of altering or modifying the terms of a prior written contract, [the oral modification] must be a valid and binding contract itself, resting upon some new and distinct consideration."). The party seeking to establish an oral modification of a written contract bears the burden of proving consideration. Hare v. Endersby, 3d Dist. Allen Nos. 1-15-46 & 1-15-47, 2015-Ohio-5442, 2015 WL 9461777, ¶ 45 ; Baker & Hostetler, LLP v. Delay, 10th Dist. Franklin No. 08AP-1007, 2009-Ohio-2507, 2009 WL 1486628, ¶ 19. A promise to complete an already existing obligation does not constitute consideration to support a contract. Shannon v. Universal Mtge. & Discount Co. , 116 Ohio St. 609, 621, 157 N.E. 478 (1927).
{¶ 27} In the case sub judice, there has not been a change in the parties' course of performance, or an oral agreement supported by new or separate legal consideration, to support Barclay's claim that the lease was modified. This is so because under the plain and unambiguous language of the lease, as executed in 1984, the lessee always had the express obligation to provide free domestic gas to the lessor at a single dwelling house. Specifically, the lease provides as follows: "Lessor may lay a line to any gas well on said lands and use gas for light and heat in one dwelling house on said lands, at Lessor's own risk and expense, subject to the reasonable rules and regulations of Lessee and the use and right of abandonment of the well by Lessee." Accordingly, the parties' course of performance in providing and accepting free domestic gas at a single dwelling house does not evidence an intent to modify the lease-these actions are what is required under the express terms of the lease. Likewise, no new consideration existed for the alleged oral modification of the lease. Therefore, Barclay's claim that the lease was modified by the parties' course of performance or by a subsequent oral agreement is without merit.
D. The Doctrines of Estoppel and Waiver Do Not Bar the Baileys' Request that the Court Declare the Lease Expired By Operation of Law and Under the Express Terms of the Lease
{¶ 28} Barclay argues, and the trial court agreed, that the doctrines of estoppel and waiver barred the Baileys from seeking cancellation of the lease. Specifically, Barclay contends that because the Lucases continually accepted the free domestic gas for use in their dwelling, and did not seek to formally terminate the lease for lack of production, the Baileys, as the Lucases' successors-in-interest, are now barred from seeking cancellation. This proposition is without merit.
{¶ 29} First, the Baileys are not seeking cancellation of the lease, but rather *822 a declaration that the lease has already automatically terminated under its express terms and by operation of law. This is an important distinction because under Ohio law once an oil and gas lease expires on its terms, the lessor has no duty to cancel the lease by undertaking some affirmative act. See Tisdale , supra , at *4 ("The terminology utilized in the habendum clause ( [e.g.,] 'and as long thereafter as') is generally construed to create a determinable fee interest, such that the lessee's interest automatically terminates upon lessee's failure to satisfy any of the listed provisions would serve to extend the terms of the lease. In such a case, no affirmative action on the part of the lessor is required to formally terminate the lease; it expires on its own terms .") (Emphasis added.); Lekan , supra , at 212, 598 N.E.2d 1315 ("If after the expiration of the primary term the conditions of the secondary term are not continuing to be met, the lease terminates by the express terms of the contract herein and by operation of law and revests the leased estate in the lessor"). Thus, when Barclay failed to meet the conditions of the secondary term of the lease because there was no production from the wells from 2010-2012, the lease terminated by its own terms; no further action was required by the Baileys or their predecessors-in-interest.
{¶ 30} Furthermore, this Court recently discussed whether the acceptance of benefits estopped a landowner from asserting a breach of an oil and gas lease and noted that the question "turned on the facts of each case and whether the acceptance of the benefit is inconsistent with the landowner's legal position concerning the lease." Sims v. Anderson , 2015-Ohio-2727, 38 N.E.3d 1123, ¶ 26 (4th Dist.). We went on to hold that the fact that the landowners in Sims accepted royalty payments after the lease terminated was not inconsistent with their legal position that the lease had terminated because as the landowners they were entitled to those benefits no matter the outcome of the case. Sims at ¶ 28 ; see also Stitzlein v. Willey , 5th Dist. Holmes No. CA-318, 1979 WL 209691, *2 (Dec. 12, 1979) ("Before a party is estopped by the receipt of benefits from a transaction to deny the validity of the transaction it must initially appear that he is not otherwise entitled to those benefits."). Thus, because in the case sub judice the Lucases were entitled to benefit from the gas produced from their property, regardless of the validity of the lease, their successors-in-interest, the Baileys, are not barred by the doctrines of waiver, estoppel, or quasi-estoppel from now seeking a declaration that the lease has expired under its terms and by operation of law.
E. The Baileys' Neighbors Are Not Necessary Parties
{¶ 31} Finally, Barclay claims that the Baileys have failed to join all the necessary parties to the lawsuit as required under R.C. 2721.12(A) -in particular, the three other families who receive royalties and domestic gas from the original leasehold property.
{¶ 32} R.C. 2721.12(A) states, in relevant part: "[W]hen declaratory relief is sought * * * all persons who have or claim any interest that would be affected by the declaration shall be made parties to the action or proceeding." The absence of an interested party under this section "is a jurisdictional defect which precludes a declaratory judgment." Gareau v. Holiday Lakes Property Owners' Assn., Inc. , 6th Dist. Huron No. H-90-52, 1991 WL 154056, *3 (Aug. 9, 1991) ; see also Gannon v. Perk , 46 Ohio St.2d 301, 310-311, 348 N.E.2d 342 (1976), and Portage Cty. Bd. of Commrs. v. Akron , 109 Ohio St.3d 106, 2006-Ohio-954, 846 N.E.2d 478, ¶¶ 99-100.
{¶ 33} Barclay contends that should the Baileys obtain the declaratory judgment they seek, their neighbors' royalty rights *823 and right to free gas under the lease would extinguish. Thus, Barclay argues that the Baileys' failure to join their neighbors violates R.C. 2721.12(A) and is fatal to their claim. We disagree.
{¶ 34} A decision in the Baileys' favor will not affect their neighbors' current rights or interests. As discussed above, the lease had already expired under its terms and by operation of law by the time the Baileys and their neighbors took possession of the leasehold property in late 2012. Thus, there was never any relationship between Barclay and the neighbors under the lease, and any such relationship that currently exists between Barclay and the neighbors will remain unchanged regardless of the Baileys' declaratory judgment action. See Potts v. Unglaciated Industries, Inc. , 2016-Ohio-8559, 77 N.E.3d 415 (7th Dist.) (holding in declaratory judgment action concerning validity of oil and gas lease that nonparty landowner/lessor was not a necessary party under R.C. 2721.12 because, inter alia, their "current position and interests were not 'affected' by the declaratory judgment" because their rights "stayed the same after the trial court's declaration"). The neighbors, as landowners, will continue to have the right to receive royalties and gas extracted from their property by Barclay regardless of the existence of a lease. Sims, supra, at ¶ 28. For these reasons, we conclude that the neighbors' current interests will not be affected by the outcome of these proceedings; and thus, the neighbors are not necessary parties under R.C. 2721.12(A).
IV. Conclusion
{¶ 35} Based on the foregoing, we sustain the Baileys' assignments of error, considered jointly, and conclude that the trial court erred in granting summary judgment to Barclay and in denying the Baileys' motion for summary judgment. Accordingly, we reverse the judgment of the trial court and remand the cause to that court to enter judgment in favor of the Baileys.
JUDGMENT REVERSED AND CAUSE REMANDED.
Abele, J: Concurs in Judgment and Opinion.
McFarland, J.: Concurs in Judgment Only.

Barclay in turn assigned away part of those rights in 1989, only to gain them back on March 27, 2013. Despite this partial assignment, Barclay has operated all wells on the leasehold property since its first assignment in 1987.